IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| DANIEL TAD WIDHSON | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| KILOLO KIJAKAZI, Acting | : | NO.  20-3343 |
| Commissioner of Social Security[1] | : | |

**MEMORANDUM AND ORDER**

ELIZABETH T. HEY, U.S.M.J.                                      July 13, 2021

Daniel Tad Widhson ("Plaintiff") seeks review of the Commissioner's decision denying his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI").  For the reasons that follow, I conclude that the decision of the Administrative Law Judge ("ALJ") is not supported by substantial evidence and remand for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

I.      **PROCEDURAL HISTORY**

Plaintiff filed for DIB and protectively filed for SSI on July 25, 2017, tr. at 78, 94, 178-79, 180-81, alleging that his disability began on November 24, 2016, as a result of autism, post-traumatic stress disorder ("PTSD"), possible bipolar disorder, depressive disorder, anxiety disorder, and asthma.  Id. at 199.  Plaintiff's applications for benefits were denied initially, id. at 110-14, 115-19, and Plaintiff requested a hearing before an ALJ, id. at 123-24, 125-26, which took place on April 18, 2019.  Id. at 35-77.  On July 5,

---

[1]Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Ms. Kijakazi should be substituted for the former Commissioner of Social Security, Andrew Saul, as the defendant in this action.  No further action need be taken to continue this suit pursuant to section 205(g) of the Social Security Act.  42 U.S.C. § 405(g).

2019, the ALJ found that Plaintiff was not disabled. Id. at 16-27. The Appeals Council

denied Plaintiff's request for review on June 19, 2020, id. at 1-3,[2] making the ALJ's July

5, 2019 decision the final decision of the Commissioner. 20 C.F.R. §§ 404.981,

416.1472.

Plaintiff commenced this action in federal court on July 6, 2020, Doc. 1, and the

matter is now fully briefed and ripe for review. Docs. 13 & 14.[3]

## II.    LEGAL STANDARD

To prove disability, a claimant must demonstrate an "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment . . . which has lasted or can be expected to last for . . . not less than twelve

months." 42 U.S.C. § 423(d)(1). The Commissioner employs a five-step process,

evaluating:

> 1.      Whether the claimant is currently engaged in
> substantial gainful activity;
>
> 2.      If not, whether the claimant has a "severe
> impairment" that significantly limits his physical or mental
> ability to perform basic work activities;
>
> 3.      If so, whether based on the medical evidence,
> the impairment meets or equals the criteria of an impairment

[2]Although the Notice of Appeals Council Action is undated, see tr. at 1, a related order and the Index indicate that the Appeals Council denied review on June 19, 2020. See id. at 5; Court Transcript Index.

[3]Defendant consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c). See Standing Order, In RE: Direct Assignment of Social Security Appeal Cases to Magistrate Judges (Pilot Program) (E.D. Pa. Sept. 4, 2018). Plaintiff is deemed to have consented based on his failure to file the consent/declination form and the notices advising him of the effect of not filing the form. Docs. 2, 4 & 6.

listed in the listing of impairments ("Listings"), 20 C.F.R. pt. 404, subpt. P, app. 1, which results in a presumption of disability;

4.      If the impairment does not meet or equal the criteria for a listed impairment, whether, despite the severe impairment, the claimant has the residual functional capacity ("RFC") to perform his past work; and

5.      If the claimant cannot perform his past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform.

See Zirnsak v. Colvin, 777 F.3d 607, 610 (3d Cir. 2014); see also 20 C.F.R.

§§ 404.1520(a)(4), 416.920(a)(4).  Plaintiff bears the burden of proof at steps one through

four, while the burden shifts to the Commissioner at the fifth step to establish that the

claimant is capable of performing other jobs in the local and national economies, in light

of his age, education, work experience, and RFC.  See Poulos v. Comm'r of Soc. Sec.,

474 F.3d 88, 92 (3d Cir. 2007).

The court's role on judicial review is to determine whether the Commissioner's

decision is supported by substantial evidence.  42 U.S.C. § 405(g); Schaudeck v. Comm'r

of Soc. Sec., 181 F.3d 429, 431 (3d Cir. 1999).  Therefore, the issue in this case is

whether there is substantial evidence to support the Commissioner's conclusion that

Plaintiff is not disabled.  Substantial evidence is "such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion," and must be "more than a mere

scintilla."  Zirnsak, 777 F.2d at 610 (quoting Rutherford v. Barnhart, 399 F.3d 546, 552

(3d Cir. 2005)).  The court has plenary review of legal issues.  Schaudeck, 181 F.3d at

431.

## III.    DISCUSSION

### A.    ALJ's Findings and Plaintiff's Claims

The ALJ found that Plaintiff suffered from the severe impairments of obesity, autism/Asperger's disorder, mood disorder/depression, anxiety, and PTSD.  Tr. at 18.  In addition, the ALJ found that Plaintiff suffers from the non-severe impairments of asthma, fatty liver, hypothyroidism, psoriasis, right wrist sprain, and diplopia, the impact of which the ALJ considered throughout the disability determination process.  Id. at 18-19.  The ALJ also found that there were no medically determinable impairments to explain Plaintiff's complaints of left knee and low back pain, and that there was never a firm diagnosis of obsessive-compulsive disorder.  Id. at 19.  The ALJ next found that Plaintiff did not have an impairment or combination of impairments that met the Listings, id., and that Plaintiff retained the RFC to perform medium work with the following limitations: frequently climb ramps and stairs, balance, and stoop; occasionally kneel, crouch, and crawl; never climb ladders, ropes, or scaffolds;  occasionally be exposed to work involving unprotected heights, moving mechanical parts, operating a motor vehicle, humidity, wetness, dust, odors, fumes, pulmonary irritants, extreme cold, and extreme heat; can only perform, use judgment, and tolerate occasional changes in a routine work setting defined as that consistent with routine and repetitive tasks, and can only have occasional interaction with supervisors, coworkers, and the public.  Id. at 20.  The ALJ then found that Plaintiff could not perform his past relevant work as an automobile self-serve station attendant.  Id. at 25.  Finally, based on the testimony of a vocational expert ("VE"), the ALJ found that jobs exist in significant numbers in the national economy that

Plaintiff can perform, including warehouse worker, hand packager, and laundry laborer. Id. at 26.

Plaintiff claims that the ALJ erred in failing to (1) accord proper weight to Plaintiff's treating psychiatrist, (2) accord proper weight to Plaintiff's testimony and that of his mother, and (3) find that Plaintiff met Listing 12.10. Doc. 13 at 8-14.[4] Defendant responds that the ALJ correctly considered the evidence offered by Plaintiff's psychiatrist and the Listing determination is supported by substantial evidence. Doc. 15 at 4-14.[5]

## B. **Plaintiff's Claimed Limitations**

Plaintiff was born on May 9, 1994, making him 23 years old at the time of his applications and 25 years old at the time of the ALJ's decision. Tr. at 178, 180. He completed one year of college and worked as a self-service gas station attendant until November 2016. Id. at 40-42.

At the administrative hearing, Plaintiff explained that he suffers from "[t]errible social anxiety," has urges of hurting himself, and suffers from chronic insomnia. Tr. at 42. Plaintiff testified that he has met up monthly with 6 -to- 15 high school friends to play video games, but recently finds that he does not stay long before returning home. Id. at 46. When he gets "very intrusive thoughts" of hurting himself or a panic attack, he

---

[4]Other than the administrative record, for which I will utilize its own pagination, for pinpoint page references to documents filed in this court I will refer to the Court's ECF pagination. I have reordered Plaintiff's arguments for ease of discussion, to address the ALJ's consideration of the evidence before addressing the Listing.

[5]Defendant addresses Plaintiff's testimony and that of his mother as part of Defendant's discussion of Listing 12.10. Doc. 15 at 6-10.

takes Xanax.  Id. at 49-50.[6]  Plaintiff explained that he has voluntarily committed himself to the Horsham Clinic when he had thoughts of self-harm with pens, pencils, and kitchen utensils.  Id. at 50.  His parents lock the knives away when he visits and cover the utensils when they go out to eat.  He described the panic attacks where he starts pacing and making weeping sounds and curls up in a ball.  Id. at 54.  Plaintiff spends much of his time playing various video and on-line games, and keeps a game player nearby in case he feels overwhelmed.  Id. at 48-49, 57.

Plaintiff testified about incidents of rage when he was in high school, chasing a classmate around the gymnasium who had hit him with a basketball, and throwing a desk at another student.  Tr. at 51.  More recently, when feeling like he was being betrayed by his friends, he "ripped [his] headset in half and broke [his] desk in half."  Id. at 51.  When he was working and felt anxious, he would call his parents and yell at them for upwards of 30 minutes and threaten suicide.  Id. at 52.  Once when he got angry at his mother, he "snapped and screamed and punched a hole through [his] [f]ather's basement stair wall."  Id. at 53.  At one point Plaintiff got a therapy cat, but he was overwhelmed with fear that he was going to hurt the cat and had to give it up after just a few days.  Id. at 54.

Plaintiff claims that his depression makes him distrustful and makes him question his place in the world.  Tr. at 55.  At times the depression makes him forget to take his medication.  Id.  Two to four days a week, he does not get out of bed.  Id. at 56.  Being around children causes post-traumatic flashbacks.  Id.

---

[6]Plaintiff listed other medications as well, tr. at 49, which I will summarize when reviewing the medical records.

Plaintiff's mother, Deborah Schwabe, also testified at the hearing, explaining that prior to Plaintiff's move to South Carolina, she had gotten him an apartment to see if he could live independently. Tr. at 61.[7] She lived there half of the week, but it did not work out and he moved back to his father's house. Id. at 61-62. Then she made arrangements for him to move in with a friend in South Carolina, all the while she was handling all the bills. Id. at 62. Although Plaintiff had a job at the self-service gas station, his mother reported that he would call her multiple times a week during his shift to vent, by yelling at her until she could "talk him down." Id. at 62-63. During that time, she saw a deterioration in his mental health. Id.

When she relocated him back home, within a mile of his father's house, she made sure that he had a support system nearby. Tr. at 64. She testified, however, that he continued to deteriorate more to the point that he could not have spoons, knives, forks, pens or pencils in house for fear of self-harm. Id. at 64. She described his depression as "overwhelming," noting that he would stay in bed all day and always talked about hurting himself. Id. She also related that in fits of anger he had broken a gaming headset, a desk, and a gaming system he "split in half," and instances where he "flipped out" in reaction to seemingly minor problems. Id. at 65-67.

He continues to call her three or four times a week at "all hours of the night." Tr. at 69. When asked if there was any job he could perform, she explained that she was

_____

[7]Plaintiff moved to South Carolina in October 2014, and returned in December 2016. Tr. at 287.

concerned with his "stability" and said that she did not think "he has the stability to stick with something because he's constantly breaking down." Id. at 68, 69.

## C.   **Summary of the Medical Record**[8]

The medical record includes treatment notes from Plaintiff's primary care group, Doylestown Health, which indicate that prior to his claimed disability onset date he was treated for anxiety with Celexa and was prescribed Xanax for situational issues.[9] Tr. at 282.  When Plaintiff returned from South Carolina in December 2016 (roughly coincident with the alleged onset date of November 24, 2016), Michael Barmach, M.D., noted that Plaintiff denied any significant depression symptoms, but still had regular anxiety including impulsive urges to gouge his eyes out for which he continued to take Celexa daily and Xanax less than once a week.  Id. at 287.

On December 21, 2016, Plaintiff began treatment at the Penn Foundation for anxiety and depressive thoughts.  Tr. at 309-17.  Charlotte Batcha, L.C.S.W., noted that Plaintiff's memory and concentration/attention were impaired, he had a good mood, his thought form was illogical and tangential with flight of ideas and paranoid delusions, and he had self-injurious thoughts and obsessions/compulsions evidenced by video games.

---

[8]Because Plaintiff's claims focus primarily on his mental health impairments, I will focus on the records relevant to the assessment of those impairments.  With respect to his diagnosis of obesity, Plaintiff is approximately 5 feet 10 inches tall and weighs approximately 340 pounds.  Tr. at 314

[9]Celexa (generic citalopram) is an antidepressant.  See https://www.drugs.com/celexa.html (last visited June 29, 2021).  Xanax (generic alprazolam) is a benzodiazepine used to treat anxiety disorders and anxiety caused by depression.  See https://www.drugs.com/xanax.html (last visited June 29, 2021).

Id. at 312.  Ms. Batcha's notes indicate that Plaintiff got confused with his medication, taking Xanax regularly when he was supposed to be taking Celexa.  Id. at 309.  She noted that he was abused by extended family from age 4, when his mother left, through age 14 or 15.  Id. at 315.  She diagnosed Plaintiff with generalized anxiety disorder ("GAD"),[10] depressive disorder NOS (not otherwise specified),[11] and autistic disorder.[12]  Id. at 317.  Plaintiff requested individual therapy rather than group therapy due to his anxiety and poor social skills.  Id. at 318.

George Ehrhorn, M.S.N., a certified registered nurse practitioner at the Penn Foundation, evaluated Plaintiff on January 13, 2017.  Tr. at 307-08.  Plaintiff reported to Mr. Ehrhorn that his concentration and motivation were poor, his memory "is awful," and

---

[10]"The key features of [GAD] are persistent and excessive anxiety and worry about various domains, including work and school performance, that the individual finds difficult to control.  In addition, the individual experiences physical symptoms including restlessness or feeling keyed up or on edge; being easily fatigued; difficulty concentrating or mind going blank; irritability; muscle tension; and sleep disturbance."  Diagnostic and Statistical Manual of Mental Disorders, 5th ed. (2013) ("DSM 5"), at 190.

[11]Unspecified depressive disorder "applies to presentations in which symptoms characteristic of a depressive disorder that cause clinically significant distress or impairment in social, occupational, or other important areas of functioning dominate but do not meet the full criteria for any of the disorders in the depressive disorders diagnostic class."  DSM 5 at 184.

[12]"Autism spectrum disorder is characterized by persistent deficits in social communication and social interaction across multiple contexts, including deficits in social reciprocity, nonverbal communicative behaviors used for social interaction, and skills in developing, maintaining, and understanding relationships.  In addition to the social communication deficits, the diagnosis of autism spectrum disorder requires the presence of restricted, repetitive patterns of behavior, interest, or activities."  DSM 5 at 31.  Plaintiff reported to Ms. Batcha that he was diagnosed with Asperger's disorder in 2008 or 2009 after a fight in school.  Tr. at 309.  Autism spectrum disorder encompasses Asperger's disorder.  DSM 5 at 53.

he had no energy.  Tr. at 307.  Plaintiff also reported a problem going to and staying

asleep.  Id.  Plaintiff explained that before Christmas, he had taken his Xanax instead of

his antidepressant and "had a really bad breakdown."  Id.  On Mental Status Examination

("MSE"), Mr. Ehrhorn noted that Plaintiff was calm, his memory, attention,

concentration, and language were intact, and his thought form was tangential, with fair

insight and judgment.  Id. at 308.  He prescribed Risperdal[13] to help with Plaintiff's

paranoia and anxiety.  Id.  In May, Abilify[14] was also added to the medication regimen.

Id. at 303.  Plaintiff's May 2017 Treatment Plan indicated diagnoses of GAD, depressive

disorder, NOS, autistic disorder, and PTSD.[15]  Id. at 304.

Plaintiff was voluntarily admitted to the Horsham Clinic on April 4, 2017, with

"ruminative thoughts of fears that he would kill himself."  Tr. at 319.  During his week-

long admission, he was diagnosed with an unspecified mood disorder and a history of

Asperger's disorder.  Id.  The Discharge Summary noted that he was less depressed and

impulsive, and had less fear that he might harm himself during his hospitalization.  Id. at

---

[13]Risperdal (generic risperidone) is an antipsychotic used to treat schizophrenia
and symptoms of bipolar disorder.  See https://www.drugs.com/risperdal.html (last
visited June 29, 2021).

[14]Abilify (generic aripiprazole) is an antipsychotic used to treat schizophrenia and
bipolar 1 disorder.  See https://www.drugs.com/abilify.html (last visited June 29, 2021).

[15]The essential feature of PTSD is the development of characteristic symptoms
following exposure to one or more traumatic events, as well as persistent avoidance of
stimuli associated with the traumatic event(s).  DSM 5 at 274-75.

320.  He was discharged on April 10, 2017, with prescriptions for citalopram and risperidone, and continued on a Ventolin inhaler for his asthma.[16]  Id.

On April 21, 2017, Robert J. Grabowski, D.O., at Doylestown Health, diagnosed Plaintiff with a moderate episode of recurrent major depressive disorder ("MDD")[17] and noted that Plaintiff was under the care of a Dr. George at the Penn Foundation.  Id. at 297-98.[18]

On June 22, 2017, Scott Harman, M.D., a psychiatrist at the Penn Foundation, noted that Plaintiff experienced a recent "melt down" after a flashback brought on by his personal items being broken after being given to his step-mother's grandchildren.  Tr. at 349.  The doctor noted that Plaintiff's medication adherence/response was fair.  Id.  On MSE, Dr. Harman found that Plaintiff's affect was congruent and constructed/detached, memory, attention and concentration were intact, thought form was logical, and insight and judgment were fair.  Id. at 350.  The doctor continued Plaintiff on Abilify, Lamictal,[19] and Xanax for severe anxiety.  Id.  On July 11, 2017, Dr. Harman noted that

---

[16]Ventolin (generic albuterol) is a bronchodilator used to treat and prevent bronchospasm.  See https://www.drugs.com/ventolin.html (last visited June 29, 2021).

[17]The essential feature of MDD is a clinical course that is characterized by one or mor major depressive episodes.  DSM 5 at 160-61.  A major depressive episode is a period of at least two weeks during which there is either depressed mood or the loss of interest or pleasure in nearly all activities.  Id. at 163.

[18]Presumably "Dr. George" refers to nurse practitioner George Ehrhorn.

[19]Lamictal (generic lamotrigine) is an anticonvulsant used to treat epileptic seizures and to delay mood episodes in adults with bipolar disorder.  See https://www.drugs.com/lamictal.html (last visited June 29, 2021).

Plaintiff was very restless, was having trouble sleeping, and had increased impulses for self-harm. Id. at 351. On MSE, Dr. Harman noted that Plaintiff endorsed suicidal ideation. Id. at 352. The doctor discontinued Abilify and added Zyprexa.[20] Id. On July 20, 2017, Plaintiff reported that he was sleepy on Zyprexa, but had decreased impulses and akathisia.[21] Id. at 353. On August 10, 2017, Plaintiff reported feeling better on Zyprexa. Id. at 355. On MSE, Dr. Harman noted that his affect was congruent and constricted and his mood was anxious. Id. at 356.

Plaintiff was again voluntarily admitted to the Horsham Clinic on August 27, 2017, with complaints of mood instability with thoughts of harming himself by poking himself in the eye and aggression towards others. Tr. at 321. He was diagnosed with unspecified mood disorder, autism spectrum disorder, and a rule out diagnosis of obsessive-compulsive disorder ("OCD").[22] Id. Plaintiff remained on Lamictal, Xanax and Zyprexa, and the attending psychiatrist added Luvox[23] for Plaintiff's OCD-like traits.

---

[20]Zyprexa (generic olanzapine) is an antipsychotic used to treat schizophrenia and bipolar disorder. See https://www.drugs.com/zyprexa.html (last visited June 29, 2021).

[21]Akathisia is "a condition of motor restlessness in which there is a feeling of muscular quivering, an urge to move about constantly, and an inability to sit still." Dorland's Illustrated Medical Dictionary, 32nd ed. (2012) ("DIMD"), at 42.

[22]"OCD is characterized by the presence of obsessions and/or compulsions. *Obsessions* are recurrent and persistent thoughts, urges, or images that are experienced as intrusive and unwanted, whereas *compulsions* are repetitive behaviors or mental acts that an individual feels driven to perform in response to an obsession or according to rules that must be applied rigidly." DSM 5 at 235 (emphasis in original).

[23]Luvox (generic fluvoxamine) is an antidepressant used to treat social anxiety disorder and OCD involving recurring thoughts or actions. See https://www.drugs.com/mtm/luvox.html (last visited June 29, 2021).

Id. at 322.  He was discharged on September 6, 2017, with a "brighter affect and was no longer endorsing violent ideations."  Id. at 323.

When Plaintiff returned to the Penn Foundation on September 28, 2017, he reported to Dr. Harman that he had some improvement after his discharge from Horsham Clinic.  Tr. at 357.  His mood was stable, affect remained congruent and constructed, memory, attention, and concentration were intact, insight was fair to limited, and judgment was fair.  Id. at 358.  Dr. Harman noted chronic insomnia and prescribed Ambien.[24]  Id. at 359.  Plaintiff's insomnia complaints persisted when he saw Dr. Harman on October 26, 2017, and he reported urges to self-harm and an obsessive ideation to "gouge [his] eyes out."  Id. at 360.  The doctor planned to discontinue Ambien and start Lunesta.[25]  Id. at 361.

Plaintiff continued seeing Dr. Harman at least monthly (at times bi-weekly depending on his symptoms) through February 2019.  Tr. at 362-98.  During this time, he had complaints of insomnia and intrusive thoughts of self-harm that waxed and waned, and Dr. Harman would titrate or change medications in an effort to decrease these symptoms.  See, e.g., id. at 362-63 (11/16/17 - increasing intrusive thoughts of self-harm, increase Luvox), 364-66 (11/30/17 - aggressive/self-harmful thoughts, increase Zyprexa and taper Luvox), 367-68 (12/14/17 – decreased thoughts of self-harm with tapering of

---

[24]Ambien (generic zolpidem) is a sedative used to treat insomnia.  See https://www.drugs.com/ambien.html (last visited June 29, 2021).

[25]Lunesta (generic eszopiclone) is a sedative used to treat insomnia.  See https://www.drugs.com/lunesta.html (last visited June 29, 2021).

Luvox, discontinue Ambien and try Lunesta for insomnia), 373-74 (2/2/18 - increased

impulses for self-harm/destruction of property, titrate Zoloft[26]), 375 (3/29/18 – negative

encounter with people but stopped taking medication for two weeks prior), 379-80

(5/18/18 – picture of a knife provoke urge for self-harm, increase Wellbutrin[27]), 383-84

(8/10/18 - more anxious without Zyprexa which was stopped due to urinary hesitancy,

restart Zyprexa because urinary hesitancy continued while off Zyprexa),[28] 385-86

(8/24/19 – intrusive thoughts including thought of biting off little finger, increase

Zyprexa), 389-90 (10/19/18 – trial of Remeron[29] resulted in irritable, agitated feelings,

prescribed Prozac[30]), 391-92 (11/16/18 – Prozac resulted in feeling of constant

depression, no motivation and MSE indicated obsessions/compulsions for self-harm,

retry Zoloft), 397 (2/22/19 – thoughts of self-harm after not taking medication for several

days).

---

[26]Zoloft (generic sertraline) is an antidepressant used to treat depression, OCD, panic disorder, anxiety disorders, and PTSD. See https://www.drugs.com/zoloft.html (last visited June 29, 2021).

[27]Wellbutrin (generic bupropion) is an antidepressant used to treat MDD and seasonal affective disorder. See https://www.drugs.com/wellbutrin.html (last visited June 29, 2021).

[28]Treatment notes from Doylestown Health also evidence complaints of urination hesitancy and frequency beginning on April 13, 2018. Tr. at 410.

[29]Remeron (generic mirtazapine) is an antidepressant used to treat MDD. See https://www.drugs.com/remeron.html (last visited June 29, 2021).

[30]Prozac (generic fluoxetine) is an antidepressant used to treat MDD, bulimia nervosa, OCD, and panic disorder. Prozac is also used in conjunction with Zyprexa to treat manic depression caused by bipolar disorder. See https://www.drugs.com/prozac.html (last visited June 29, 2021).

Plaintiff began individual psychotherapy with Daniel Stahlberger, M.Ed., in February 2019. Tr. at 395.[31] Plaintiff reported that he had gone off his medication for four days and wanted to hurt himself, "but got back on his meds and things are fine." Id. On March 1, 2019, Plaintiff again reported going off his medications, but planned to take them after the session. Id. at 399. The therapist noted that Plaintiff was making slight progress, but the loss of a close friend could have caused some anxiety/depression. Id. at 400. On March 8, 2019, Mr. Stahlberger noted that Plaintiff had moderate social anxiety, but was making slight progress. Id. at 402.

On March 15, 2019, Dr. Harman completed a Mental Impairment Questionnaire, with diagnoses of unspecified mood disorder, unspecified anxiety disorder with panic episodes, and borderline personality traits, noting that Plaintiff suffers from chronic and obsessive urges to harm himself, compulsory unwanted impulses, anxiety, fearfulness, the feeling that he cannot trust himself around any sharp objects, and constricted/detached affect. Tr. at 403. The doctor found that Plaintiff had marked limitations in activities of daily living and deficiencies in concentration, persistence or pace, and extreme limitation in social functioning.[32] Id. at 405. The doctor also indicated

---

[31]Although Dr. Harman noted that Plaintiff was beginning peer support therapy in February 2018, see tr. at 373, and Mr. Stahlberger made reference to Plaintiff's report that he worked with peer support through the Penn Foundation, see id. at 395, no such notes appear in the record.

[32]The Questionnaire form had a four-point scale: None-mild, Moderate, Marked, or Extreme. Tr. at 405. The only definition for these categories was "marked," which "means more than moderate but less than extreme. A marked limitation my [sic] arise when several activities or functions are impaired or even when only one is impaired, so long as the degree of limitation is such as to seriously interfere with the ability to function independently, appropriately, effectively, and on a sustained basis." Id.

that Plaintiff had 1 or 2 episodes of decompensation in the prior 12-month period, each lasting at least 2 weeks in duration, and that he was unable to sustain employment. Id. at 405, 406.

Amanda Kochan-Dewey, Psy.D., conducted a Mental Status Evaluation on October 2, 2017. Tr. at 324-27. At that time, Plaintiff reported showering once or twice a week, dressing daily, preparing food, cleaning, and shopping. Id. at 326. He also reported playing video games, talking online, and watching cartoons. Id. On MSE, Dr. Kochan-Dewey found that Plaintiff's thought processes were coherent and goal directed; affect was restricted; mood was neutral; attention and concentration were intact; recent and remote memory were intact; and insight and judgment were good. Id.

Dr. Kochan-Dewey diagnosed Plaintiff with unspecified depressive disorder and PTSD, and found that he had no limitations in the abilities to understand, remember, and carry out instructions. Tr. at 326, 328. [33] She determined that Plaintiff had mild impairment in his ability to interact appropriately with co-workers, supervisors, and the

_____

The scale in the form pertains to the mental health Listings, which were revised effective January 17, 2017. See "Revised Medical Criteria for Evaluating mental Disorders," 81 Fed. Reg. 66138-01 (Sept. 26, 2016). An ALJ is to use the Listings in effect at the time of his or her decision. Id. ("When the final rules become effective, we will apply them to new applications filed on or after the effective date of the rules, and to claims that are pending on or after the effective date."). Therefore, the revised mental health listings are applicable in this case. The form utilized by Dr. Harman refers to the categories contained in the "B Criteria" prior to the revision. The relevant Listing will be discussed further below. Infra at 29-30.

[33]The form defined "None" as "[a]ble to function in this area independently, appropriately, effectively, and on a sustained basis." Tr. at 328. "Mild" limitation was defined as "[f]unctioning in this area independently, appropriately, effectively, and on a sustained basis is slightly limited." Id.

public, and respond appropriately to usual work situations and to changes in a routine work setting.  Id. at 329.  The doctor stated that Plaintiff's impairment did not affect his ability to concentrate, persist, maintain pace, or to adapt or manage himself.  Id.

At the initial determination stage, Francis Murphy, Ph.D., found from a review of the records that Plaintiff suffered from depressive, bipolar, and related disorders and autism spectrum disorder.  Tr. at 84.  Dr. Murphy found that Plaintiff had mild limitation in his ability to understand, remember or apply information, and moderate limitation in his abilities to interact with others, concentrate, persist, or maintain pace, and adapt or manage oneself.  Id.  Specifically, Dr. Murphy found no understanding or memory limitations, but a moderate limitation in the ability to maintain attention and concentration for extended periods.  Id. at 89.  The doctor also found Plaintiff moderately limited in his ability in his abilities to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, and to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness.  Id. at 90.  Finally, in the area of adaptation limitations, the doctor found Plaintiff moderately limited in his ability to set realistic goals and make plans independently of others.  Id.

With respect to physical limitations at the initial consideration stage, on November 14, 2017, Crescenzo Calise, M.D., determined that Plaintiff could occasionally lift and/or carry 50 pounds, and frequently lift and/or carry 25 pounds, stand for 6 hours, and sit for 6 hours in an 8-hour workday.  Tr. at 86.  Dr. Calise also concluded that Plaintiff should never climb ladders, ropes or scaffolds, could occasionally crawl, and should avoid

17

concentrated exposure to extreme cold, heat, humidity, fumes, odors, dusts, gases, poor ventilation, and hazards.  Id. at 87-88.

Ziba Monfared, M.D., conducted an Internal Medicine Examination on October 30, 2017, and found that Plaintiff's physical abilities were limited by his obesity and asthma, resulting in limitations to occasional kneeling or crouching and frequent crawling, and occasional exposure to humidity and wetness, dust, odors, fumes, and pulmonary irritants, and extreme cold and extreme heat.  Tr. at 332-41.

### D.  **Plaintiff's Claims**

1.  Consideration of Plaintiff's Subjective Complaints and Testimony from his Mother

Relying on Ninth Circuit caselaw, Plaintiff argues that the ALJ failed to properly consider his testimony and that offered by his mother.  Doc. 13 at 12-13 (citing Fair v. Bowen, 885 F.2d 597 (9th Cir. 1989); Morgan v. Comm'r of Soc. Sec., 169 F.3d 595 (9th Cir. 1999)).  Plaintiff also argues that the ALJ "selectively misinterpreted the testimony of Plaintiff and his mother in reaching his improper determination."  Id. at 13.  Defendant responded to this allegation in addressing the ALJ's consideration of the relevant Listing, arguing that the evidence belies Plaintiff's testimony concerning the severity of his mental health symptoms and his mother's assertion that he is unable to live independently.  Doc. 14 at 7.

With regard to evaluating a claimant's subjective symptoms, the regulations require consideration of all symptoms and the extent to which such symptoms are reasonably consistent with the objective medical and other evidence, including the

claimant's statements and descriptions from medical and non-medical sources regarding how the symptoms affect the claimant's activities of daily living and ability to work. 20 C.F.R. §§ 404.1529(a), 416.929(a). The regulations make clear that statements about a claimant's pain or other symptoms cannot alone establish a disability, but instead there must be objective medical evidence from an acceptable medical source that shows the presence of an impairment that could reasonably be expected to produce the symptoms alleged and that, when considered with all the other evidence, would lead to a disability determination. Id.

Social Security Ruling 16-3p provides guidance about how the Commissioner will evaluate statements regarding the intensity, persistence, and limiting effects of symptoms in disability claims. See S.S.R. 16-3p, "Titles II and XVI: Evaluation of Symptoms in Disability Claims," 2016 WL 1119029 (Mar. 16, 2016). The Ruling directs an ALJ to conduct a two-step process to (1) determine whether the claimant has a medically determinable impairment that could reasonably be expected to produce the claimant's alleged symptoms, and (2) evaluate the intensity and persistence of the claimant's symptoms such as pain and determine the extent to which they limit his ability to perform work-related activities. Id. at *3-5.

Third Circuit case law does not require an ALJ to accept a plaintiff's complaints concerning his symptoms, but rather requires that they be considered. See Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 363 (3d Cir. 2011). An ALJ may disregard subjective complaints when contrary evidence exists in the record, see Mason v. Shalala, 994 F.2d 1058, 1067-68 (3d Cir. 1993), but must explain why he rejects such complaints

with references to the medical record.  See Hartranft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999) ("Allegations of pain and other subjective symptoms must be supported by objective medical evidence."); Matullo v. Bowen, 926 F.2d 240, 245 (3d Cir. 1990) (ALJ may reject claim of disabling pain where he has considered subjective complaints and specified reasons for rejecting claims).  In addition to objective medical evidence, in evaluating the intensity and persistence of pain and other symptoms, the ALJ should consider the claimant's daily activities; location, duration, frequency and intensity of pain; precipitating and aggravating factors; type, dosage, effectiveness, and side effects of medications; treatment other than medication; and other measures the claimant uses to address the pain or other symptoms.  20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

Here, Plaintiff testified about urges to inflict harm on himself, tr. at 42, 50, 51, 56, anger outbursts id. at 51, 53, calling his parents to vent and threatening to kill himself, id. at 52, and panic attacks where he acted like a scared animal.  Id. at 55.  In addition, he testified that due to his depression he sometimes does not get out of bed and forgets to take his medication.  Id. at 55.  Plaintiff's mother reiterated many of these symptoms based on her own observation.  Id. at 62-68.  In addition, she also described her failed attempt to have Plaintiff live independently during which she lived with him half the week, id. at 61, his living arrangements in South Carolina during which she saw a deterioration in his mental health, id. at 62, and his return to this area, after which she saw him "deteriorate more and more," staying in bed all day and determining that he had an inability to have spoons, knives and forks in the house due to a fear of self-harm.  Id.

at 64.  Despite her efforts to give her son independence, Ms. Schwabe testified that she handled his bills and did his grocery shopping when he was local.  Id. at 62.

Although the ALJ acknowledged that Plaintiff "has significant mental health issues that have imposed some functional limitations," he found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [his] symptoms are not entirely consistent with the medical evidence and other evidence in the record." Tr. at 21.  In support of his finding, the ALJ partially relied on the consultative examination conducted by Dr. Kochan-Dewey, who found Plaintiff's attention, concentration, and memory intact; his cognitive functioning average; insight and judgment good; thought processes coherent and goal directed with no hallucinations or delusions; motor behavior normal; speech fluent; and eye contact appropriate.  Id. at 22-23 (citing id. at 326).  The ALJ also noted that subsequent to the consultative examination, the treatment notes from the Penn Foundation "revealed a normal [MSE] at his baseline level."  Id. at 23.[34]

The ALJ did not adequately consider Plaintiff's or his mother's testimony.  First, the ALJ's characterization of the MSE subsequent to the consultative examination as "normal" is a mischaracterization of the evidence, undermining the ALJ's reliance on those records to discount the testimony.  The November 16, 2017 treatment notes from

---

[34]It is unclear whether the ALJ was referring to a single MSE from the Penn Foundation visit closest in proximity to the consultative examination or multiple MSEs following the consultative examination, in general.  In either event, as will be discussed, the subsequent MSEs were not "normal" as they evidenced Plaintiff's intrusive thoughts and compulsions/urges for self-harm.

the Penn Foundation, the first after Plaintiff's examination by Dr. Kochan-Dewey, do not

support rejection of Plaintiff's and his mother's testimony. Dr. Harman noted Plaintiff's

reports of increased intrusive thoughts of self-harm, specifically thoughts of stabbing

himself or gouging out his eyes, and that Plaintiff's attempt to get a therapy cat failed

because it "induced excess fears/worries." Tr. at 362. "[Plaintiff] presenting dramatic

negative thinking, with isolated affect." Id. The MSE that the ALJ categorized as normal

included disheveled appearance, anxious mood, incongruent, constricted and detached

affect, endorsing self-injurious thoughts and obsessions/compulsions including gouging

out his eyes and fears of self-injury, negative and dramatic thoughts, and poor insight. Id.

at 363. Moreover, review of all of Dr. Harman's treatment notes reveals chronic suicidal

thoughts or thoughts of self-harm, and abnormalities in his mood and/or affect. See id. at

352 (7/11/17 – suicidal ideation, disheveled, sad mood and constricted affect), 361

(10/26/17 – self-injurious thoughts, obsessions/compulsions, including gouging his eyes

or stabbing self, affect constricted), 363 (11/16/17 - self-injurious thoughts,

obsessions/compulsions fears of self-injury, anxious mood, detached and constricted

affect), 365 (11/30/17 – suicidal and homicidal ideation, self-injurious thoughts chronic

and increased, sad and anxious mood, constricted affect), 368 (12/14/17 – suicidal

ideation, homicidal ideation, self-injurious behaviors, paranoid delusions and impulsivity,

dysphoric mood, constricted detached affect), 372 (1/5/18 – self-injurious thoughts,

anxious mood, constricted detached affect), 374 (2/2/18 – self-injurious thoughts

included impulses for self-harm, obsessions/compulsions, stable dysphoric mood,

incongruent, constricted, detached affect), 376 (3/29/18 – self-injurious thoughts with

impulses for self-harm, stable dysphoric mood, incongruent, constricted detached affect),
380 (5/18/18 – obsessions/compulsions), 382 (6/8/18 – same), 384 (8/10/18 – same), 386
(8/24/18 – obsessions/compulsions including self-harm urges), 388 (9/21/18 - same), 390
(10/19/18 – same), 392 (11//16/18 – same), 394 (12/14/18 – same), 398 (2/22/19 – same).

Second, in considering Plaintiff's subjective complaints the ALJ failed to consider
the efficacy of Plaintiff's medications as required by the governing regulations. See 20
C.F.R. §§ 404.1529(c)(3), 416.929(c)(3) (requiring consideration of type, dosage,
effectiveness, and side effects of medications in evaluating subjective complaints).
Review of Dr. Harman's treatment notes reveals continuing intrusive thoughts of self-
harm and insomnia despite multiple changes of medication. See supra at 13-14. The
ALJ's opinion is devoid of any consideration of Plaintiff's medications and their efficacy
(or lack thereof).

Finally, Plaintiff accuses the ALJ of distorting the testimonial evidence to support
his conclusion. Doc. 13 at 13. Plaintiff's argument is akin to the premise that an ALJ is
not permitted to "cherry-pick[ ] or ignore[e] medical assessments that r[u]n counter to her
finding." Rios v. Comm'r of Soc. Sec., 444 F. App'x 532, 535 (3d Cir. 2011) (citing,
inter alia, Dougherty v. Barnhart, Civ. No. 05-5383, at *10 n. 4 (E.D. Pa. Aug. 21, 2006);
Colon v. Barnhart, 424 F. Supp.2d 805, 813-14 (E.D. Pa. 2006)); see also Schroeder v.
Berryhill, Civ. No. 16-464, 2017 WL 4250057, at *17 (M.D. Pa. Sept. 5, 2017) ("sort of
evaluation, where the evaluator mentions only isolated facts that militate against the
finding of disability and ignores much other evidence that points another way, amounts to

a 'cherry-picking' of the record which this Court will not abide") (quoting <u>Fanelli v.</u>

<u>Colvin</u>, Civ. No. 16-1060, 2017 WL 551907, at *9 (W.D. Pa. Feb. 10, 2017)).

Here, the ALJ relied on Plaintiff's testimony that he had friends with whom he

socialized and was active on social media to find that Plaintiff had only moderate

limitations in the domain of interacting with others. <u>Tr.</u> at 19-20. Likewise, in

considering Dr. Harman's assessment (which will be discussed in greater detail later in

the next section), the ALJ relied on this testimony to reject Dr. Harman's finding that

Plaintiff had extreme difficulties in maintaining social functioning and marked restriction

in activities of daily living. <u>Id.</u> at 25. The ALJ, however, failed to consider Plaintiff's

testimony and that of his mother attesting to the fact that his depression caused him to

stay in bed all day at times and that his mother described the deterioration of his mental

health, anger outbursts, and inability to live independently. On remand, the ALJ shall

consider all of the testimonial evidence and specifically explain his reasons for rejecting

the evidence suggestive of limitations in the areas of functioning relevant to consideration

of the Listings and in determining Plaintiff's RFC.

### 2.   Consideration of Treating Physician Opinion

Plaintiff also claims that the ALJ failed to accord proper weight to the opinion of

Plaintiff's treating psychiatrist, Dr. Harman, noting that the doctor's opinion is entitled to

controlling weight if it is "well supported by medically acceptable clinical and laboratory

diagnostic techniques and is not inconsistent with the other substantial evidence in [the]

case." Doc. 13 at 11 (citing 20 C.F.R. § 404.1527(c)(2)). Before addressing Plaintiff's

challenge to the ALJ's consideration of Dr. Harman's opinion, I must first address the regulatory scheme governing such consideration.

Plaintiff is relying on the regulations that govern the consideration of medical opinion evidence for claims filed prior to March 27, 2017. The new regulations, which apply to claims filed on or after that date, abandon the concept of evidentiary weight and focus instead on the persuasiveness of each medical opinion.

> We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources.

20 C.F.R. §§ 404.1520c(a), 416.920c(a). The regulations list the factors to be utilized in considering medical opinions: supportability, consistency, relationship including the length and purpose of the treatment relationship and frequency of examinations, specialization, and other factors including familiarity with other evidence in the record or an understanding of the disability program. Id. §§ 404.1520c(1), 4116.920c(1). The most important of these factors are supportability and consistency, and the regulations require the ALJ to explain these factors, but to not require discussion of the others. Id. §§ 404.1520c(2), 416.920c(2). The regulations explain that "[t]he more relevant the medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . , the more persuasive the medical opinion . . . will be." Id. §§ 404.1520c(1), 416.920c(1). In addition, "[t]he more consistent a medical opinion . . . is with the evidence from other medical sources and nonmedical sources . . . , the more persuasive the medical opinion . . . will be." Id. §§ 404.1520c(c)(2),

416.920c(c)(2). Here, Plaintiff filed his applications on July 25, 2017. Therefore, the revised regulations are applicable.

As previously noted, Dr. Harman found that Plaintiff had marked limitations in the areas of activities of daily living and concentration, persistence, and pace, and extreme limitations in the area of maintaining social functioning. Tr. at 405. The ALJ rejected Dr. Harman's assessment.

> The medical report offered by [Plaintiff's] treating source is not persuasive ([tr. at 403-06]). This opinion is not supported as there is no explanation within the four corners of the medical report as to how Dr. Harman reached his conclusions. His opinion is not consistent with the medical and other evidence of record. For example, the doctor's report is not consistent with the balance of his own [MSEs] (see e.g., [id. at 347-402]). Moreover, in terms of the old B-criteria the doctor reported that [Plaintiff] had marked restriction of activities of daily living, extreme difficulties in maintaining social functioning, and marked deficiencies of concentration, persistence, or pace. However, the record indicates, among other things, that around the same time of the doctor's report [Plaintiff] had 8-9 close friends from high school he met with regularly, had online friends, and that he loved to play videogames (see e.g., [id. at 399]). He also recently went to Comicon ([id. at 387]), uses social media, an application based messaging service, and plays Nintendo Switch and PlayStation 4 (Hearing Testimony). Moreover, as discussed above, [Plaintiff's MSE] was normal during the consultative examination and during recent treatment at Penn Foundation.

Id. at 25.

The ALJ's consideration of Dr. Harman's assessment is partially accurate. For example, the ALJ relied on Dr. Harman's own MSEs to reject his mental capacity assessment. In the assessment dated March 15, 2019, the doctor found marked deficiencies in Plaintiff's concentration, persistence, and pace. Tr. at 405. However, Dr.

Harman's own MSEs consistently indicate that Plaintiff had intact memory, attention and concentration. See tr. at 350 (6/22/17), 354 (7/20/17), 356 (8/10/17), 358 (9/28/17), 361 (10/26/17), 363 (11/16/17), 365 (11/30/17), 368 (12/14/17), 370 (12/14/17), 372 (1/5/18), 374 (2/2/18), 376 (3/29/18), 380 (5/18/18), 382 (6/8/18), 384 (8/10/18), 386 (8/24/18), 388 (9/21/18), 390 (10/19/18), 392 (11/16/18), 394 (12/14/18), 398 (2/22/19). Nevertheless, the ALJ's characterization of Dr. Harman's MSEs as "normal" despite the repeated notations of thoughts and urges of self-harm raises concerns about the ALJ's consideration of Dr. Harman's assessment.

The ALJ also relied on Plaintiff's testimony to undermine Dr. Harman's assessment, specifically with respect to social functioning. As previously discussed, the ALJ's consideration of the testimony was flawed and incomplete. See supra at 21-24. Plaintiff's mother's testimony is particularly relevant to the consideration of Plaintiff's limitations in the areas of interacting with others and managing oneself, and it is unclear if or to what extent the ALJ considered this testimony in considering the Listings and Plaintiff's RFC. It is incumbent upon the ALJ to explain his consideration of Ms. Schwabe's testimony.

Moreover, in reviewing the decision as a whole, the ALJ's consideration of the opinion evidence is concerning. As previously mentioned, in considering Dr. Kochan-Dewey's evaluation, the ALJ noted that Plaintiff had a "normal [MSE]" when he returned to the Penn Foundation after the consultative examination. Tr. at 23. This is a mischaracterization of the medical record. See supra at 21-22. Moreover, the ALJ found the findings of the State Agency Psychological Consultant persuasive. Tr. at 25. Dr.

Murphy found, from his review of the record at the time, that Plaintiff had mild limitation in his ability to understand, remember or apply information, and moderate limitation in his abilities to interact with others, concentrate, persist, or maintain pace, and adapt or manage oneself. Id. at 84. Dr. Murphy did not have the benefit of the more recent treatment records from the Penn Foundation, which evidence increased intrusive thoughts of self-harm and a series of medication changes to address this symptom and Plaintiff's chronic insomnia.

As previously noted, the revised regulations governing the consideration of opinion evidence place emphasis on supportability and consistency with the record as a whole. See 20 C.F.R. §§ 404.1520c(1)-(2), 416.920c(1)-(2). Considering the ALJ's mischaracterization of the MSEs from the Penn Foundation as normal despite endorsing thoughts and compulsions of self-harm and his failure to properly consider the testimony from Plaintiff and his mother, I also remand the case for further consideration of the mental health treatment records and opinions.

3.    Listing 12.10

Finally, Plaintiff claims that the ALJ erred in concluding that Plaintiff did not meet the requirements for Listing 12.10 under the revised criteria. Doc. 13 at 8-11.[35] Defendant responds that the ALJ's determination that Plaintiff did not meet or medically equal Listing 12.10 is supported by substantial evidence. Doc 14 at 4-10.

---

[35]As previously mentioned, see supra at 15-16 n.32, the mental health Listings were revised effective January 17, 2017, and the revised Listings apply to claims filed thereafter or pending at that time.

Listing 12.10 addresses Autism spectrum disorder and requires:

> A. Medical documentation of both of the following:
> 1. Qualitative deficits in verbal communication, nonverbal communication, and social interaction; and
> 2. Significantly restricted, repetitive patterns of behavior, interests, or activities,
> AND
> B. Extreme limitation of one, or marked limitation of two, of the following areas of mental functioning:
> 1. Understand, remember, or apply information.
> 2. Interact with others.
> 3. Concentrate, persist, or maintain pace.
> 4. Adapt or manage oneself.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.10 (internal citations omitted). The ALJ found that Plaintiff suffered from only mild limitation in understanding, remembering, and applying information, and moderate limitation in interacting with others, concentrating, persisting or maintaining pace, and adapting or managing oneself. Tr. at 19-20.[36]

In arguing that he meets Listing 12.10, Plaintiff relies on Dr. Harman's assessment in which the doctor found that Plaintiff had marked and extreme limitations in the areas of activities of daily living, social functioning, and concentration, persistence, and pace, which were the categories of functioning referred to in the B criteria of Listing 12.10 prior to the 2017 revision. Tr. at 405. Because I am remanding the case for further consideration of the mental health treatment and opinion evidence, I have no need to

---

[36]In addition to Listing 12.10, the ALJ also considered Listings 12.04 (Depressive, bipolar, and related disorders), 12.06 (Anxiety and obsessive-compulsive disorders), and 12.15 (Trauma and stressor-related disorders), which have identical "B criteria" as Listing 12.10. Tr. at 19. Plaintiff, however, has challenged only the ALJ's finding with respect to Listing 12.10. Doc. 13 at 8.

address the ALJ's decision on the Listing issue at this point. Reconsideration of the mental health evidence and the testimony may impact the ALJ's consideration of the categories of functioning.

## IV.    <u>CONCLUSION</u>

The ALJ failed to properly consider Plaintiff's testimony and that of his mother in determining the limitations imposed by Plaintiff's mental health impairments. Similarly, in considering the mental health opinion evidence, the ALJ mischaracterized MSEs performed by Plaintiff's treating psychiatrist and relied on the State Agency Medical Consultant who evaluated the record without the benefit of Plaintiff's more recent treatment records evidencing intrusive thoughts of and urges to self-harm. Because reconsideration of the mental health and opinion evidence, as well as the testimony from Plaintiff and his mother will impact consideration of Listing 12.10, I have not addressed the ALJ's consideration of the Listing.

An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DANIEL TAD WIDHSON | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| KILOLO KIJAKAZI, Acting | : | NO.  20-3343 |
| Commissioner of Social Security | : | |

## O R D E R

AND NOW, this 13th day of July, 2021, upon consideration of Plaintiff's request

for review (Doc. 13), the response (Doc. 14), and after careful consideration of the

administrative record (Doc. 10), IT IS HEREBY ORDERED that:

1. Judgment is entered REVERSING the decision of the Commissioner of Social Security for the purposes of this remand only and the relief sought by Plaintiff is GRANTED to the extent that the matter is REMANDED for further proceedings consistent with this adjudication; and

2. The Clerk of Court is hereby directed to mark this case closed.

BY THE COURT:

/s/ ELIZABETH T. HEY

_____
ELIZABETH T. HEY, U.S.M.J.